# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| ANTWINE GOMEZ, | CASE NO. 3:20-CV-02247 |
| Petitioner, | DISTRICT JUDGE JAMES S. GWIN |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| WARDEN NEIL TURNER, | **REPORT & RECOMMENDATION** |
| Respondent. | |

Petitioner Antwine Gomez ("Petitioner" or "Mr. Gomez") brings this habeas corpus action pursuant to 28 U.S.C. § 2254.  (ECF Doc. 1 ("Petition").)  Mr. Gomez filed his *pro se* Petition on September 24, 2020. (*Id*. at p. 9.)[1]  His Petition relates to his convictions for one count of importuning and four counts of rape, and his sentence of forty years to life, in Lucas County Common Pleas Court Case No. CR0201601548 following a jury trial.  (ECF Doc. 1, p. 3.)  Respondent filed an Answer/Return of Writ (ECF Doc. 6), Petitioner filed a Traverse (ECF Doc. 8), and Respondent filed a Response to Traverse (ECF Doc. 10).

This matter was reassigned to the undersigned Magistrate Judge pursuant to General Order 2021-15.  For the reasons set forth in further detail herein, the undersigned finds dismissal of the Petition is warranted because Mr. Gomez's three grounds for relief have been procedurally defaulted.  Accordingly, the undersigned recommends that the Court **DISMISS** the Petition with prejudice.

---

[1] "Under the mailbox rule, a habeas petition is deemed filed when the prisoner gives the petition to prison officials for filing in the federal courts." *Cook v. Stegall*, 295 F.3d 517, 521 (6th Cir. 2002) (citing *Houston v. Lack*, 487 U.S. 266, 273 (1988)). The Petition was docketed on October 6, 2020.  (ECF Doc. 1.)

# I.    Factual Background

"In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct."  28 U.S.C. § 2254(e)(1).  The petitioner has the burden of rebutting that presumption by clear and convincing evidence.[2]  *Id.*; *Railey v. Webb*, 540 F.3d 393, 397 (6th Cir. 2008).

The Sixth District Ohio Court of Appeals summarized the facts underlying Mr. Gomez's conviction and sentence as follows:

{¶ 15} On July 25, 2014, T.P. first informed Detective Colwell that appellant had sexually abused M.D. Following these allegations, Colwell interviewed appellant, M.D., and T.P. Appellant denied the allegations. Thereafter, Colwell obtained a DNA sample from appellant, and conducted a search of appellant's residence. During the search, M.D. walked through the residence with Colwell, showing him the areas in which the sexual assaults took place. Various items were seized from these areas, and subsequently examined by the Bureau of Criminal Investigations (BCI) for any evidence of semen. No semen was found on the seized items.

{¶ 16} Colwell referred M.D. to a sexual assault nurse examiner (SANE) nurse, Brittni Mercer. During Mercer's interview with M.D., M.D. indicated that appellant put his penis in her vagina, and stated that the sexual abuse had been going on for over two years, with the most recent occurrence taking place three days prior. Concerning the most recent rape, M.D. stated that appellant "pulled out and ejaculated and then did it again, and then when he was done told her to go shower."

{¶ 17} Mercer proceeded to conduct a physical examination of M.D., which revealed no acute injuries or abnormal findings. Mercer explained that normal physical examinations are not unusual given the rapid healing that occurs, particularly when the victim has experienced sexual abuse over a prolonged period of time.

---

[2] Mr. Gomez acknowledges this burden and "submits the trial record as clear and convincing evidence rebutting the presumption of correctness" of the state court's factual findings.  (ECF Doc. 8, p. 2.)  However, "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones.").  Mr. Gomez's general recitation of portions of trial testimony (ECF Doc. 8, pp. 2-7) lacks developed argumentation and is insufficient to satisfy the high burden to overcome the presumption of correctness provided to the state court's factual determinations.

{¶ 18} Consistent with her statements to Mercer, M.D. reported sexual abuse during an examination performed by the state's expert, Dr. Randall Schlievert, who testified that M.D. told him that the first rape occurred when she was ten years old. According to Schlievert, M.D. indicated that appellant forced her to "go into a room, take her clothes off, his clothes off, and then she pretty much said is the long and short of it is he penetrated me." Schlievert went on to recount M.D.'s reports of further touching and penetrations, stating:

> She described one time where she said she didn't want to do it, and he went to the kitchen and got a knife and held it to her to force her to do the sexual acts.

> And then there were times that she said he pulled her to the floor and would wrap his legs around her tightly and so tight to the point where she couldn't breathe and she felt like she was going to pass out. She didn't, but she felt like she was. And it sounds like these things occurred from the course of 10 to 13 years of age, and she was scared to tell.

{¶ 19} Following his examination of M.D., Schlievert authored a report that was admitted at trial. In the report, Schlievert diagnosed M.D. as sexually abused, notwithstanding the fact that M.D.'s examination did not reveal physical signs of sexual abuse. Schlievert explained at trial that a normal physical examination was not inconsistent with sexual abuse, because healing occurs rapidly and not all sexual acts generate the same injury. With respect to abuse that happened at least one month prior to the examination, Schlievert testified that a normal examination occurs "about 95 to 98 percent of the time."

{¶ 20} In conjunction with her physical examination of M.D., Mercer performed a rape kit. The rape kit was taken to BCI, where it was examined for the presence of appellant's DNA. Appellant's DNA was not present on the rape kit. Colwell explained that, in his years of experience investigating "well over 100" crimes of sexual assault, a lack of DNA evidence is not uncommon, especially where, as here, there is a delayed disclosure of sexual abuse and a lapse of time during which any DNA would be removed from the victim's person. According to Colwell, the most recent incident involving appellant occurred three days prior to the first report of sexual abuse.

{¶ 21} As Colwell was conducting his initial investigation into the allegations of sexual abuse, he was contacted by the Lucas County Prosecutor's Office and informed that appellant had voluntarily taken and passed a polygraph test. As a result of the polygraph results, Colwell suspended his investigation, only to reopen the investigation 19 months later when he learned that appellant had started to communicate with M.D. again.

3

{¶ 22} During the reopened investigation, Colwell obtained possession of M.D.'s mobile phone, along with printouts of the messages contained therein. Colwell delivered M.D.'s phone for analysis of its contents to Sergeant Josh Seney of the Sylvania Police Department. Seney's subsequent analysis of the phone revealed the existence of Facebook messages that were sent from appellant's Facebook account, along with text messages and photos that were sent from a device utilizing appellant's mobile phone number. The messages retrieved from M.D.'s phone include incriminating statements pertaining to instances of prior sexual activity that occurred when M.D. was 10 years old. Additionally, three photos of appellant, two photos of a penis, and one photo of a vagina, all sent from appellant's mobile number, were retrieved from M.D.'s phone.

{¶ 23} In order to verify that the phone number from which the messages and photos were sent belonged to appellant, Colwell instructed T.P. to pose as M.D. and send a message to the number, asking appellant to bring food to M.D.'s school. As previously noted, appellant subsequently arrived at the school to deliver food to M.D., prompting Colwell's interview of appellant at the police station. At the conclusion of the interview, appellant provided Colwell with his contact information, including a mobile phone number that matched the number associated with the messages and photos discovered on M.D.'s mobile phone.

{¶ 24} On the third day of trial, the state's prosecutor disclosed that she had discussed Mercer's testimony with Schlievert. Specifically, the prosecutor informed the court: "So while speaking to Dr. Schlievert the State commented on the SANE exam testimony because it was her first time ever testifying. The State had articulated regarding how well the State thought she did, and that she even explained things like the hymen very well."

{¶ 25} Following the state's disclosure, appellant moved the trial court for a dismissal of all charges with prejudice, arguing that the prosecutor's discussion with Schlievert constituted prosecutorial misconduct in light of the agreed-upon separation of witnesses that was in place during the trial. Alternatively, appellant moved for a mistrial. In the event that his motion for a dismissal or mistrial was denied, appellant requested that Schlievert not be permitted to testify during the state's case-in-chief. Upon consideration, the trial court denied appellant's requests, finding that the prosecutor's conversation with Schlievert did not prevent appellant from having a fair trial and that any issues arising from the conversation could be addressed by appellant on cross-examination.

{¶ 26} The trial continued and Schlievert was permitted to testify. After Schlievert was finished testifying, the state called M.D. At the outset, M.D. indicated that she was born in November 2000, and was in the tenth grade at the time of trial.

{¶ 27} Throughout her testimony, M.D. detailed four instances in which she was raped by appellant. Consistent with prior statements she made to investigators,

M.D. testified that appellant first began raping her when she was ten years old. M.D. explained that the rapes were a form of punishment. She testified that appellant would force her to choose to either be beaten all over her body with a belt or to have sex with him when she "didn't do something right," and she stated that appellant raped her "very often."

{¶ 28} Regarding the first rape, M.D. testified:

A. It was at night, and he had called me in the room, and he asked me if I knew what sex was. And I said no.

And then he was like okay. And then I was sitting on the edge of the bed, and he told me if I liked anyone at school, and I said no. And then he told me to think of someone like a celebrity or someone that I liked and pretend like it was one of them. And then he started to like touch me, and then it got to the point where he put his penis inside of me.

Q. Okay. When you say he put his penis inside of you where did he put it?

A. My vagina.

{¶ 29} Later in her testimony, M.D. detailed a second rape that occurred while she lived in Maumee, Ohio. The day before the incident, appellant and T.P. were involved in an argument over M.D.'s hygiene. The next day, appellant pulled M.D. to the side, threatened to stab her with a kitchen knife, raped her, and told her not to speak to her mother about what had happened between him and her.

{¶ 30} M.D. testified that the third rape occurred after M.D. moved to Sylvania, Ohio, three months prior to her thirteenth birthday. Describing the third rape, M.D. stated that appellant pushed her against the wall and told her to stop trying to push him away, at which point he raped her. Afterwards, M.D. cleaned up and appellant dropped her off at school.

{¶ 31} M.D. went on to describe the fourth and most recent rape. She testified that appellant directed her to put on a dress, and then proceeded to "put his penis inside [her] vagina."

{¶ 32} After questioning M.D. about the foregoing rapes, the state moved on to a discussion about a Facebook friendship M.D. had with an individual named Aladona Jones. M.D. explained that Aladona first contacted her and told her that she too had been raped by her stepfather. M.D. responded to Aladona's message, and a conversation ensued during which M.D. told Aladona about the rapes involving appellant. Aladona suggested that M.D. resume contact with appellant.

{¶ 33} M.D. heeded Aladona's advice and a group chat involving M.D., Aladona, and appellant began. Subsequently, Aladona informed M.D. that she had contracted the HIV virus, and that there was a chance she might die. According to M.D., Aladona made M.D. promise to continue to talk to appellant if she died. At some point, a picture of a woman in the hospital was sent to M.D. from appellant's Facebook account. M.D. believed the account to be appellant's, because the profile picture was a photo of appellant, and the discussions she and appellant had over Facebook pertained to prior sexual acts and other information that only appellant would have known about. Ultimately, appellant sent M.D. a photo of himself holding money, and stating that he was about to pay for Aladona's funeral and cremation. M.D. testified that appellant also sent her photos of his penis.

{¶ 34} Following M.D.'s testimony, the state called T.P., who stated that she confiscated M.D.'s mobile phone after noticing suspicious activity. T.P. instructed M.D. to unlock the phone, at which point T.P. learned that appellant was communicating with M.D. and sending her pictures of his penis, which she found on the phone. T.P. also noticed the group chat M.D. had been having with appellant and Aladona. Upon further investigation, T.P. noticed that Aladona, who was supposedly two years older than M.D. and went to the same high school in Sylvania, suspiciously only shared one mutual Facebook friend with M.D., which was appellant. Further, T.P. noticed that Aladona and M.D. shared the same birthday. T.P. testified that Aladona seemed particularly interested in M.D. Ultimately, T.P. suspected that Aladona was not in fact a real person. Relatedly, Colwell was unable to find anyone by the name of Aladona Jones despite consulting several databases, including a database that includes death records for all individuals who are deceased.

{¶ 35} At the close of the state's case-in-chief, appellant moved for an acquittal under Crim.R. 29(A), arguing that the state failed to introduce sufficient evidence as to when exactly the alleged rapes took place, and further failed to establish that he was the individual who sent the electronic communications to M.D. Upon consideration, the trial court denied appellant's motion, and the matter proceeded to appellant's case-in-chief.

{¶ 36} Appellant's sole witness was Donald Smith, who testified that he is a pastor of the church appellant attended, Sylvania Community Church of the Christian Missionary Alliance. Smith first met appellant at a ministry breakfast meeting in June 2014, after which point they became good friends. Smith testified that appellant was a "minister of the word" at the church, and was "dutiful in terms of making sure that the church was kept clean and very diplomatic in that regard."

{¶ 37} After Smith's testimony concluded, appellant took the stand. Regarding discipline, appellant testified that he would lecture M.D. when she needed to be disciplined, and that he employed the same forms of corporal punishment with

M.D. as he did with the other children. Appellant denied having ever raped M.D. as a form of punishment. He further stated that he never had any sexual contact with M.D.

{¶ 38} When asked about his communications with M.D., appellant acknowledged that the phone number associated with the Facebook and text messaging pulled from M.D.'s phone was his phone number. Appellant further acknowledged that the photos found on M.D.'s phone were photos of his penis, but he insisted that he had no knowledge as to how they were sent to M.D. Appellant stated that his phone was not password protected, and could be used by anyone with access to it. While appellant admitted to having communicated with M.D. on Facebook, he insisted that none of the sexually explicit communications attributed to him by the state were actually sent by him.

{¶ 39} Continuing on in his testimony, appellant explained that he was contacted by T.P. on the day he was found attempting to deliver food to M.D. at her school. According to appellant, T.P. called him and asked him to bring food to M.D.'s school. Appellant stated that he received a text message from M.D. after he had already agreed to deliver food for T.P.

{¶ 40} Following his case-in-chief, appellant renewed his Crim.R. 29 motion, which was again denied by the trial court. The parties then presented their closing arguments, and the jury retired for deliberations. Thereafter, the jury returned with guilty verdicts on all counts contained in the indictment.

*State v. Gomez*, 2019-Ohio-576, ¶¶ 15-40, 2019 WL 647552, at **3-6 (Ohio App. Ct. 2019);

(ECF Doc. 6-1, pp. 130-39.)

## II.     Procedural Background

### A.     State Court Conviction

A Lucas County Grand Jury issued an indictment on March 23, 2016, charging Mr. Gomez with: one count of Importuning, in violation of R.C. 2907.07(D)(1) and (F)(3); one count of Rape, in violation of R.C. 2702.02(A)(2) and (B); and three counts of Rape, in violation of R.C. 2907.02(A)(1)(b) and (B). (ECF Doc. 6-1, pp. 4-7.) On May 9, 2016, Mr. Gomez pled not guilty. (*Id*. at p. 126.) On October 26, 2016, through counsel, Mr. Gomez filed a motion to suppress statements made during a March 15, 2016 police interview. (*Id*. at pp. 8-15.) The State opposed the motion to suppress. (*Id*. at pp. 16-21.) Following a hearing on the

7

motion to suppress, the court ordered additional briefing.  (*Id*. at p. 22.)  The parties filed their briefs as ordered on November 28, 2016.  (*Id*. at pp. 23-31, 32-42.)  The trial court denied the motion to suppress on February 27, 2017.  (*Id*. at pp. 43-47.)

The case proceeded to a jury trial.  (ECF Doc. 6-1, pp. 48-50.)  On April 17, 2017, the jury found Mr. Gomez guilty as charged in the indictment.  (*Id*.)  The trial court sentenced Mr. Gomez to an aggregate prison term of forty years to life.  (*Id*.)  Mr. Gomez was classified as a Tier III child victim offender.  (*Id*.)

## B.     Direct Appeal

Mr. Gomez, through counsel, filed a notice of appeal in the Sixth District Court of Appeals on May 26, 2017.  (ECF Doc. 6-1, pp. 51-54.)  Mr. Gomez's appellate brief was filed on January 29, 2018.  (*Id*. at pp. 55-87.)  He raised the following four assignments of error:

> 1. The trial court erred to the prejudice of Appellant in denying his motion to suppress in violation of his rights under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Article I, Section 10 and 16 of the Ohio Constitution.
>
> 2. The trial court erred in denying Appellant's motion for a new trial based on prosecutorial misconduct.
>
> 3. The trial court erred in denying Appellant's Rule 29 motion for acquittal at the completion of the State's case in chief.
>
> 4. The jury's verdict was against the manifest weight of the evidence introduced by the State at trial.

(*Id*. at pp. 56, 64-72.)  The State filed a brief in response on June 22, 2018.  (*Id*. at pp. 88-122.) On September 26, 2018, the State filed a notice of additional relevant authority. (*Id*. at pp. 123-24.)  The court of appeals affirmed the judgment of the trial court on February 15, 2019.  (*Id*. at pp. 125-57.)  Mr. Gomez did not file an appeal of this decision with the Supreme Court of Ohio.

**C.     Petition to Vacate or Set Aside Judgment of Conviction or Sentence**

On August 2, 2018, Mr. Gomez filed a *pro se* petition to vacate or set aside judgment of conviction or sentence.  (ECF Doc. 6-1, pp. 158-69.)  He set forth the following claim:

> Statement of constitutional claim: Trial court erred to the prejudice of defendant in violation of his rights under the 5th and 14th Amendments of the U.S. Constitution; Section 16, Article I, Ohio Constitution.
>
> Short statement of facts supporting the claim: The trial court erred to the prejudice of defendant when it had an armed uniformed deputy escort and sit with defendant on the witness stand as defendant gave testimony in violation of his rights under the 5th and 14th Amendments of the U.S. Constitution; Section 16, Article I, Ohio Constitution eroding defendant's presumption of innocence.

(*Id*. at p. 163.)  On September 12, 2018, the State filed a motion to dismiss/motion for summary judgment/answer to motion to correct void judgment.  (*Id*. at pp. 170-83.)  On May 7, 2019, the trial court denied Mr. Gomez's petition, finding the petition was not well-taken and presented no substantive grounds for relief.  (*Id*. at pp. 184-87.)

On May 29, 2019, Mr. Gomez filed a *pro se* notice of appeal from the trial court's denial of his petition to vacate or set aside judgment of conviction or sentence.  (ECF Doc. 6-1, pp. 188-89.)  On June 7, 2019, Mr. Gomez filed a second notice of appeal from the trial court's May 2019 decision denying his petition to vacate or set aside judgment of conviction or sentence.  (*Id*. at pp. 190-91.)  The court of appeals consolidated the appeals on July 5, 2019, and found Mr. Gomez's notices of appeal incomplete.  (*Id*. at pp. 192-93.)  Mr. Gomez was provided time to correct the deficiencies.  (*Id*.)  On July 19, 2019, Mr. Gomez filed an amended notice of appeal.  (*Id*. at pp. 194-97.)  Mr. Gomez filed his appellate brief on July 23, 2019.  (*Id*. at pp. 198-219.)  He raised the following assignment of error:

> 1. The trial court erred to the prejudice of Appellant when it abused its discretion when it had an armed uniformed deputy to escort and sit with Appellant on the witness stand, violating his right to a fair trial secured by the 6th and 14th Amendments, eroding his presumption of innocence.

9

(*Id*. at pp. 201, 204, 209-19.)  On August 12, 2019, the State filed its appellate brief.  (*Id*. at pp. 220-37.)  On March 6, 2020, the court of appeals affirmed the trial court's denial of Mr. Gomez's petition for postconviction relief.  (*Id*. at pp. 238-41.)  The court found that it could "affirm the trial court's judgment without reaching the merits of the petition," concluding that the issues raised "could have been raised on direct appeal but were not" and therefore the petition was barred by *res judicata*.  (*Id*. at p. 239-40.)  Mr. Gomez did not file an appeal from this decision with the Supreme Court of Ohio.

**D.     Delayed Application to Reopen Appeal**

Mr. Gomez also filed a *pro se* application to reopen his appeal pursuant to Ohio App. R. 26(B) on May 31, 2019.  (ECF Doc. 6-1, pp. 242-330.)  He argued that his appellate counsel was ineffective for failing to raise certain issues on appeal, asserting:

> He alleged the performance of his appellate counsel was deficient as follows:
>
> 1. Appellant counsel was ineffective when he failed to argue trial counsel was ineffective for only arguing the non-essential element in the Appellant's Crim.R. 29(A) motion in violation of due process of law as guaranteed by the Fourteenth Amendment to the Constitution of the United States and Article 1, Section 10 of the Ohio Constitution.
>
> 2. Appellant counsel did not argue in whole the Prosecutor's [m]isconduct that denied the Defendant-Appellant due process of law as [g]uaranteed by the Fourteenth Amendment to the Constitution of the United States and Article I, Section 10 of the Ohio Constitution, ignoring the improper comments made by the Prosecution in the closing remarks.

(*Id*. at pp. 248-57, 259-60.)  He argued that he had good cause for his delay in filing his Ohio App. R. 26(B) application because he submitted his application to prison officials for priority mailing on May 1, 2019, fourteen days prior to the filing deadline.  (*Id*. at pp. 243, 246.)  His filing was returned by the court because he mailed it to an incorrect address.  (*Id*.)  He mailed it to the Sixth District Court of Appeals, not the clerk for the Court of Appeals in Lucas County.

(*Id*. at pp. 244, 246.)  The court returned Mr. Gomez's filing to him on May 14, 2019, via

United States Postal Services Priority Mail 2-Day.  (*Id*. at pp. 244-45.)  It was received in the

North Central Correctional Institute mailroom on May 20, 2019, after the filing deadline.  (*Id*. at

p. 245.)  Mr. Gomez argued that even though he mailed his application to an incorrect address,

that was a "mute [*sic*] point," and his delayed filing should be accepted,

> since the application to reopen was sent priority 2-day mail fourteen days prior to
> deadline and would have been returned by prior 2-day mail had it been received
> as indicate[d].  There would have been more than enough time to change the
> address and re-mail application to be filed timely.  The fact that priority mail was
> not honored in both mailings from and to Appellant was prejudicial to Appellant
> and beyond my control impeding my efforts to comply with the States procedure
> rule resulting in a delay of timely filing the application to reopen direct appeal.

(*Id*. at p. 246; *see also id*. at p. 247 ("had it not been for 2-day priority mail taking 6 or more

days both ways Applicant would have still been timely").)  On July 1, 2019, the State opposed

the application for reopening, arguing that the application should be denied because Mr. Gomez

had not demonstrated "good cause for the delay in filing" or "a colorable claim of ineffective

assistance of counsel."  (*Id*. at pp. 331-37.)  On July 17, 2019, the court of appeals denied Mr.

Gomez's delayed application to reopen his direct appeal.  (*Id*. at pp. 338-41.)  The court of

appeals concluded that Mr. Gomez's "claims that postal delays and misinformation concerning

where to send his application led to the untimeliness of his application" did not establish good

cause to excuse the 90-day time limit under App. R. 26(B).  (*Id*. at p. 340.)  The court also

found his arguments that his appellate counsel was ineffective lacked merit.  (*Id*. at pp. 340-41.)

On August 26, 2019, Mr. Gomez filed a notice of appeal (ECF Doc. 6-1, pp. 342-43)

and memorandum in support of jurisdiction (*id.* at pp. 344-63) with the Supreme Court of Ohio.

He raised the following propositions of law:

> I. A rape conviction is not sufficient when the essential element of sexual conduct
> under R.C. 2907.02 is not proven beyond reasonable doubt.

11

II. Due process demands are great and neither a trial court nor appellate court may abdicate its responsibility to enter a judgment of acquittal when the evidence is legally insufficient to support a conviction.

III. Prosecution comments outside of the admitted evidence of assumed fact unsupported by any evidence produced on the trial and are grounds for reversal regardless of *Miranda* or *Griffin*.

(*Id*. at pp. 345, 356-58.)  On August 27, 2019, the State filed a waiver of memorandum in response.  (*Id*. at p. 364.)  On October 15, 2019, the Supreme Court of Ohio declined to accept jurisdiction of the appeal.  (*Id*. at p. 365.)

**E.**     **Federal Habeas Corpus Petition**

Mr. Gomez raises three grounds for relief in his Petition:

**GROUND ONE**: Ineffective assistance of appellate counsel denial of due process.

**Supporting Facts**: Appellate counsel argued a nonessential element of sufficiency of rape and fail to argue the essential element of sexual conduct to prove insufficiency beyond a reasonable doubt.  Appellate counsel ignored the issue that was clearly stronger than the nonessential issue he presented in the first appeal of right. for example MD testimony was not consistent with her testimony to Dr., Detective, and nurse.  MD s testimony together with the states other witness does not prove sexual conduct in fact happened beyond a reasonable doubt.
.
**GROUND TWO**:  Ineffective assistance of appellate counsel denial of due process prosecutorial misconduct

**Supporting Facts**:  Prosecutor made statements at closing argument with the obvious purpose to mislead the jury with the last words before deliberation. Prosecution mislead the jury to believe that a question about if petitioner and MD made up these allegations to sue the county was asked. When infact there was no testimony to that fact what so ever.  In fact the testimony by the states witness was that the question was not ask.  Prosecution made the statement "the web he was spinning, it confused ME, because it is NOT TRUE" then again prosecution "Here is what makes sense, here is what is logical and what is TRUE.  Prosecution then shifted the burden of proof when it said "the defendant did not produced any messages" and again "there is no exhibits of his message, and again when it said "I did not see any messages did you."  These are just a

few of the remarks that were prejudicially and affected the substantial rights of the accused.

**GROUND THREE**: Trial court violated Petitioners fundamental right to a fair trial secured by the 5th, 6th, and 14th amendment by eroding his presumption of Innocence.

**Supporting Facts**: This was a case that the state produced no forensic, medical, or physical evidence that a rape occurred.  The state own witness testified that petitioner did not show any form of deception on the polygraph exam and it is to be considered that petitioner told the substantial truth.  Testimony between MD [alleged victim] and the doctor, detective and nurse were not consistent.  The trial came down to who the jury would believe.  With no evidence other than testimony and inconsistent testimony with the state's witnesses the court violated petitioner's presumption of innocence when It had a heavily armed sheriff's deputy escort and take the stand with Petitioner as he gave testimony. Essentially telling the jury that the allegations were credible because he is a danger and untrustworthy to stand trial without the unusual security.  The trial came down to who the jury would believe.  With the inconsistent testimony of the state's witnesses and no other evidence outside of testimony to prove guilt it was a plain violation when the court had a heavily armed uniform sheriff's deputy to escort and to take the stand with petitioner as he gave testimony eroding his presumption of innocence.

(ECF Doc. 1 pp. 6-8, 18-54.)

### III.     Law & Analysis

Respondent argues the Petition should be dismissed because all grounds for relief are procedurally defaulted.  (ECF Doc. 6, pp. 15-20, 22-24; ECF Doc. 10, pp. 9-13.)  Alternately, Respondent argues that the Petition should be denied because all grounds for relief are without merit.  (ECF Doc. 6, pp. 21-22; ECF Doc. 10, pp. 13-20.)  In response, Mr. Gomez argues that this Court should find any procedural default of Grounds One and Two excused because he can demonstrate cause and prejudice as to the untimely filing of his Ohio App. R. 26(B) application to reopen his appeal.  (ECF Doc. 8, pp. 11.)  He argues this Court should not find Ground Three procedurally defaulted because the state court of appeals misapplied *res judicata* when affirming the trial court's denial of his postconviction petition.  (*Id*. at p. 11.)  Further, he argues this Court should excuse any procedural default of Ground Three because he can demonstrate

cause and prejudice to excuse his failure to file an appeal with the Supreme Court of Ohio from the court of appeals' denial of his postconviction petition.  (*Id*. at pp. 11-13.)  In addition to his procedural default arguments, Mr. Gomez presents arguments in support of the merits of each of his three grounds for relief.  (ECF Doc. 8, pp. 13-40.)

## A.      Standard of Review Under AEDPA

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996, PL 104–132, April 24, 1996, 110 Stat 1214, 110 Stat. 1214 ("AEDPA"), apply to petitions filed after the effective date of the AEDPA.  *See Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007).  "As amended by AEDPA, 28 U.S.C. § 2254 sets several limits on the power of a federal court to grant an application for a writ of habeas corpus on behalf of a state prisoner."  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).  Under 28 U.S.C. § 2254, federal courts may "entertain only those applications alleging that a person is in state custody 'in violation of the Constitution or laws or treaties of the United States'" and in most instances, federal courts may not grant habeas relief "unless . . . the applicant has exhausted state remedies."  *Id.* (citing 28 U.S.C. §§ 2254(a), (b), (c)).  Further, if an application for writ of habeas corpus involves a claim that was "adjudicated on the merits in State court proceedings," the application "shall not be granted unless the adjudication of the claim"

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2); *Cullen*, 563 U.S. at 181; *Harrington v. Richter*, 562 U.S. 86, 100 (2011); *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007).  The burden of proof rests with the petitioner.  *See Cullen*, 563 U.S. at 181.

**B.      Claims Were Procedurally Defaulted**

For the reasons explained below, the undersigned concludes that Mr. Gomez

procedurally defaulted all grounds for relief raised in his Petition and has failed to demonstrate

a basis upon which his procedural defaults should be excused.

**1.      Legal Standard for Procedural Default**

A federal court may not grant a writ of habeas corpus unless the petitioner has exhausted

all available remedies in state court.  *See* 28 U.S.C. § 2254(b)(1)(A).  A state defendant with

federal constitutional claims must fairly present those claims to the state courts before raising

them in a federal habeas corpus action.  *See* 28 U.S.C. § 2254(b), (c); *Anderson v. Harless*, 459

U.S. 4, 6 (1982) (per curiam); *Picard v. Connor*, 404 U.S. 270, 275-76 (1971); *see also Fulcher*

*v. Motley*, 444 F.3d 791, 798 (6th Cir. 2006) ("Federal courts do not have jurisdiction to

consider a claim in a habeas petition that was not 'fairly presented' to the state courts").  To

satisfy the fair presentation requirement, a habeas petitioner must present both the facts and

legal theories underpinning his claims to the state courts.  *See McMeans v. Brigano*, 228 F.3d

674, 681 (6th Cir. 2000).  This means that the petitioner must present his claims to the state

courts as federal constitutional issues and not merely as issues arising under state law.  *See, e.g.*,

*Baldwin v. Reese*, 541 U.S. 27, 33-34 (2004); *Franklin v. Rose*, 811 F.2d 322, 324-25 (6th Cir.

1987).  A constitutional claim for relief must also be presented to the state's highest court to

satisfy the fair presentation requirement.  *See O'Sullivan v. Boerckel*, 526 U.S. 838, 845-48

(1999); *Hafley v. Sowders*, 902 F.2d 480, 483 (6th Cir. 1990).

A petitioner must also meet certain procedural requirements to have his claims reviewed

in federal court.  *See Smith v. Ohio Dep't of Rehab. & Corr.*, 463 F.3d 426, 430 (6th Cir. 2006).

"Procedural barriers, such as . . . rules concerning procedural default and exhaustion of

remedies, operate to limit access to review on the merits of a constitutional claim." *Daniels v. United States*, 532 U.S. 374, 381 (2001).  Although procedural default is sometimes confused with exhaustion, exhaustion and procedural default are distinct concepts.  *See Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006).  Failure to exhaust applies where state remedies are "still available at the time of the federal petition."  *Id.* at 806 (quoting *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982)).  In contrast, where state court remedies are no longer available, procedural default applies rather than exhaustion.  *See Williams*, 460 F.3d at 806.

Procedural default may occur in two ways.  First, a petitioner may procedurally default a claim if he fails "to comply with state procedural rules in presenting his claim to the appropriate state court."  *Id.*  In *Maupin v. Smith,* the Sixth Circuit articulated a four-prong analysis to be used when determining whether a claim is procedurally barred due to failure to comply with a state procedural rule: (1) whether there is a state procedural rule applicable to petitioner's claim, and whether petitioner failed to comply with that rule; (2) whether the state court enforced the procedural rule; (3) whether the state procedural rule is an adequate and independent state ground on which the state can foreclose review of the federal constitutional claim; and (4) whether the petitioner can demonstrate cause for his failure to follow the rule and that he was actually prejudiced by the alleged constitutional error.  785 F.2d 135, 138 (6th Cir. 1986); *see also Williams*, 460 F.3d at 806 ("If, due to the petitioner's failure to comply with the procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted.") (citing *Maupin*, 785 F.2d at 138).

Second, "a petitioner may procedurally default a claim by failing to raise a claim in state court, and pursue that claim through the state's 'ordinary appellate review procedures.'"

16

*See Williams*, 460 F.3d at 806 (quoting *O'Sullivan*, 526 U.S. at 848); *see also Baston v. Bagley*, 282 F.Supp.2d 655, 661 (N.D. Ohio 2003) ("Issues not presented at each and every level [of the state courts] cannot be considered in a federal habeas corpus petition."); *State v. Moreland*, 552 N.E. 2d 894, 899 (Ohio 1990) (finding failure to present a claim to a state court of appeals constituted a waiver). "If, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, the claim is procedurally defaulted." *Williams*, 460 F.3d at 806. Thus, even if the exhaustion requirement is technically satisfied because no state remedies remain available to the petitioner, the petitioner's prior failure to present those claims for consideration in state court may cause a procedural default that bars federal court review of the claims. *See Williams,* 460 F.3d at 806 (citing *Coleman v. Thompson,* 501 U.S. 722, 732 (1991)).

To overcome procedural default, a petitioner must: (1) show cause for the default and demonstrate that actual prejudice resulted from the alleged violation of federal law; or (2) show that there will be a fundamental miscarriage of justice if the claims are not considered. *See Coleman*, 501 U.S. at 750. "A fundamental miscarriage of justice results from the conviction of one who is 'actually innocent.'" *Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006) (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).

## 2. Claims in Grounds One and Two Were Procedurally Defaulted

In Grounds One and Two, Mr. Gomez argues that his appellate counsel was ineffective. (ECF Doc. 1, pp. 6-7, 18-39; ECF Doc. 8, pp. 13-37.) Respondent argues that Mr. Gomez procedurally defaulted these claims because the state court of appeals denied his application to reopen his delayed appeal as untimely. (ECF Doc. 6, pp. 15, 20-22; ECF Doc. 10, pp. 9-11.) Mr. Gomez responds that he can show "cause" and "prejudice" to excuse his procedural default.

(ECF Doc. 8, pp. 8-11.)  He also argues that failure to consider his claims would result in a fundamental miscarriage of justice.  (*Id.* at p. 13.)

### i.    State Court of Appeals' Denial of Application to Reopen

Mr. Gomez raised his ineffective assistance of counsel claims in a delayed application to reopen his direct appeal.  (ECF Doc. 6-1, pp. 242-330.)  The state court of appeals denied the application on July 17, 2019, finding his "claims that postal delays and misinformation concerning where to send his application led to the untimeliness of his application" did not establish good cause to excuse the 90-day time limit under App. R. 26(B).[3]  (*Id*. at pp. 338-41.)

### ii.    Petitioner Failed to Comply with State Procedural Rules

A petitioner may procedurally default by failing "to comply with state procedural rules in presenting his claim to the appropriate state court."  *See Williams*, 460 F.3d at 806.  This is the basis upon which Respondent argues Mr. Gomez has procedurally defaulted Grounds One and Two of the Petition.  To assess procedural default on this standard, courts in the Sixth Circuit apply the four-prong *Maupin* analysis.  *See id.* at 807 (citing *Maupin*, 785 F.2d at 138).

Under the first prong of the *Maupin* analysis, this Court must determine whether Mr. Gomez failed to comply with a state procedural rule.  *See* 785 F.2d at 138.  The first prong is met here.  Absent a showing of good cause, the deadline for filing an App. R. 26(B) application to reopen a direct appeal is ninety-days from journalization of the appellate judgment.  *See* Ohio App. R. 26(B).  The appellate court's judgment was journalized on February 15, 2019.  (ECF Doc. 6-1, p. 125.)  Thus, Mr. Gomez's App. R. 26(B) application was due no later than May 16, 2019.  His application was untimely because it was not filed until May 31, 2019.  (*Id*. at p. 242.)

Under the second prong of the *Maupin* analysis, this Court must determine whether the state enforced its procedural rule.  *See* 785 F.2d at 138.  The second prong is met in this case, as

---

[3] The court also found his arguments lacked merit.  (ECF Doc. 6-1, pp. 340-41.)

the state court of appeals enforced Ohio's App. R. 26(B) filing requirements when it held that Mr. Gomez's application was not timely and that he failed to establish good cause to excuse his untimely filing.  (ECF Doc. 6-1, pp. 338-40.)

Under the third prong of the *Maupin* analysis, this Court must determine whether the procedural rule establishes an adequate and independent state law ground under which the claim may be procedurally defaulted.  *See* 785 F.2d at 138.  A defendant claiming ineffective assistance of appellate counsel must apply to the Ohio Court of Appeals to reopen the direct appeal under Ohio App. R. 26(B).  *Landrum v. Mitchell,* 625 F.3d 905, 916 (6th Cir. 2010); *see also Carter v. Mitchell,* 693 F.3d 555, 564 (6th Cir. 2012) (explaining "[i]n Ohio, claims of ineffective assistance of counsel . . . must be raised through an application to reopen the direct appeal pursuant to Ohio Rule of Appellate Procedure 26(B)") (citations omitted).  The state appellate court's denial of the motion to reopen because it was filed outside the ninety-day filing period is an adequate and independent state ground that serves to bar federal habeas review.  *See Landrum,* 625 F.3d at 916; *Buchanan v. Wainwright*, No. 16-4726, 2017 WL 6419101, at *2 (6th Cir. Aug. 16, 2017) ("The Ohio Court of Appeals' denial of [Rule 26(B)] application as untimely is an adequate and independent ground for procedural default of . . . claims.").  Thus, the third prong of the *Maupin* analysis has also been met.  *See* 785 F.2d at 138.

For the reasons explained above, the undersigned finds the first three *Maupin* prongs are met.  The undersigned turns next to whether the procedural default should be excused.

### iii.    Procedural Default Should Not Be Excused

If the first three prongs are met, the fourth prong of the *Maupin* analysis asks whether the procedural default should be excused.  *See* 785 F.2d at 138.  To excuse his procedural default, Mr. Gomez must: (1) show cause for the default and demonstrate that actual prejudice

19

resulted from the alleged violation of federal law; or (2) show that there will be a fundamental miscarriage of justice if the claims are not considered. *See Coleman*, 501 U.S. at 750.

### a) Petitioner has Failed to Show "Cause" to Excuse Procedural Default

To establish "cause" to excuse procedural default, a petitioner must point to "something external . . . that cannot fairly be attributed to him." *Coleman*, 501 U.S. at 753.  Mr. Gomez argues cause is established here because he gave his application to prison officials for mailing on May 1, 2019, fifteen days before the May 16, 2019 filing deadline; thus, he argues his application would have been timely absent matters outside of his control.  (ECF Doc. 8, p. 9; ECF Doc. 8-1, p. 85.)  The specific matters he argues were out of his control included: (1) the prison law clerk gave him the wrong mailing address for the clerk of the Sixth District Court of Appeals, so his May 1 mailing was returned and he had to mail an untimely filing to the correct address; and (2) mailing delays outside of his control delayed the return of his May 1 mailing until May 20, 2019.  (ECF Doc. 8, pp. 8-11.)  He offered a similar argument in his delayed application for reopening, except he did not specifically assert in that filing that it was the prison law clerk who gave him the wrong mailing address.  (ECF Doc. 6-1, pp. 246-47.)

In *Maples v. Stegall*, the Sixth Circuit held that a *pro se* petitioner had shown cause to excuse a procedural default where he "attempt[ed] to deliver his petition for mailing in sufficient time for it to arrive timely in the normal course of events."  340 F.3d 433, 439 (6th Cir. 2003).  The court found that "[t]he prison officials' inaction, which resulted in the application for leave to appeal being denied because it was filed in an untimely fashion, present[ed] an 'objective factor material to the defense [that] impeded . . . efforts to comply with the State's procedural rule.'"  *Maples*, 340 F.3d at 439 (quoting *Coleman*, 501 U.S. at 753).

However, in applying *Maples*, courts have found similar relief unwarranted where the evidence did not support a finding of "no doubt" that the petition would have arrived on time if prison officials had acted promptly, and where there was no evidence to suggest that "prison officials did not act promptly" in mailing the relevant materials.  *See Donnal v. Sheets*, No. 3:08 CV 932, 2009 WL 3126404, *3 (N.D. Ohio Sept. 24, 2009) (distinguishing *Maples*) (emphasis in original); *Lee v. Davis*, No. 07-13782-BC, 2010 WL 3070060, *3 (E.D. Mich. Aug. 3, 2010).

Here, Mr. Gomez provides a copy of a withdrawal slip dated May 1, 2019, to support his claim that he provided his application to prison officials on that date for mailing.  (ECF Doc. 8-1, p. 85.)  However, unlike *Maples*, the reasons given for the delay in this case were not mailing delays caused by prison officials, but that Mr. Gomez mailed his application to the wrong address and the priority mail packages took longer than two days to be delivered.  (ECF Doc. 6-1, pp. 246-47.)  Mr. Gomez argues that the situation is nevertheless analogous because it was a prison library law clerk who gave him the wrong mailing address.  Given the focus of the *Maples* doctrine on situations where prison officials failed to act promptly in mailing, the pertinent inquiry is whether alleged misinformation from the law clerk may constitute "cause" sufficient to excuse a procedural default.  The undersigned finds that it cannot.

Mr. Gomez reports that the Sixth District Court of Appeals administrator explained to him in a May 14, 2019 letter that his application had been mailed to a location without a filing clerk, and could not be considered by the court until it was "filed with the clerk of courts." (ECF Doc. 8-1, p. 84.)  The administrator provided Mr. Gomez with the clerk of court's address.  (*Id*.)  Although the letter was dated two days before the filing deadline, Mr. Gomez says he did not receive his returned application until May 20, 2019, four days after the filing deadline expired.  (ECF Doc. 8, p. 9; ECF Doc. 6-1, p. 245.)  After receiving the letter, Mr.

Gomez reports he spoke with the prison law clerk, who said the address he had given to Mr. Gomez "was the only address he had to the 6th District Court of Appeals and [he] did not know they did not have their own clerk at the court of appeals." (ECF Doc. 8, p. 9.)  Mr. Gomez asserts that the law clerk "was the only source [he] had available to him to provide accurate legal addresses and other legal information." (*Id*.)  He argues his procedural default should be excused because:

> [he] had no other choice but to use the information the law clerk gave and had no way of knowing the address was incorrect due to his incarceration.  The incorrect address from the law clerk caused him to be untimely.

(ECF Doc. 8, p. 9.)

The undersigned finds Mr. Gomez's argument unavailing.  The Sixth Circuit has held consistently that "ignorance of the law and procedural requirements for filing a timely notice of appeal is insufficient to establish cause to excuse [a] procedural default." *Bonilla v. Hurley*, 370 F.3d 494, 498 (6th Cir. 2004).  Even "ignorance or inadvertence" by an agent is insufficient to support a finding of "cause" because petitioners must bear the risk of their own agents' errors. *Coleman*, 501 U.S. at 753 (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)).  Thus, to support a finding of "cause," a petitioner must "show that some objective factor *external to the defense*" impeded his efforts to comply with a procedural rule.  *Id*. (emphasis added)

Based on this standard, courts have found that errors by prison law clerks do not establish "cause" to excuse a procedural default. *See, e.g., Canales v. Gray*, No. 5:18CV1857, 2021 U.S. Dist. LEXIS 134420, at *2 (N.D. Ohio July 20, 2021) (finding "improper assistance from a prison law clerk" insufficient to establish cause to excuse procedural default); *Jannke v. Cromwell*, No. 22-cv-315-jdp, 2022 U.S. Dist. LEXIS 142325, at *2 (W.D. Wis. Aug. 10, 2022) (rejecting claim that default should be excused because petitioner "was given the wrong

22

petition-for-review deadline date by a prison inmate 'law clerk'"); *Bradley v. Lawrence*, No. 19-cv-479-SMY, 2019 U.S. Dist. LEXIS 218738, at *6 (S.D. Ill. Dec. 20, 2019) (finding petitioner could not "establish cause based on the uninformed advice of a law clerk").  The undersigned finds the reasoning of these other courts persuasive.  Just as Mr. Gomez could not establish "cause" to excuse a procedural default based on incorrect or negligent advice from his own attorney, he cannot establish cause based on mistaken advice from a prison law clerk.

The undersigned therefore finds that Mr. Gomez has not demonstrated "cause" to excuse the procedural default resulting from his late filing.

### b)  Petitioner has Failed to Show Actual Prejudice

Even if Mr. Gomez could establish "cause" to excuse his procedural default, he must also demonstrate actual prejudice resulted from the alleged violation of federal law to excuse his procedural default.  *See Coleman*, 501 U.S. at 750.  For the reasons explained below, the undersigned finds that Mr. Gomez has also failed to demonstrate "actual prejudice."

To establish prejudice to excuse his procedural default, Mr. Gomez must show actual prejudice "based on his constitutional claim, irrespective of his procedural default," *Maupin*, 785 F.2d at 139, not simply that he was prejudiced due to the late filing.  In his "prejudice" argument, Mr. Gomez focuses on the prejudice he suffered due to being given "[t]he incorrect address . . . by law clerk" and "the delayed delivery [that] caused [him] to be untimely."  (ECF Doc. 8, p. 11.)  Nevertheless, he does also argue the merits of Grounds One and Two, asserting that the state court of appeals' decision on his ineffective assistance of counsel claims was unreasonable and contrary to clearly established federal law.  (ECF Doc. 8, pp. 23-24, 33, 37.)  The undersigned will therefore consider Mr. Gomez's arguments on the merits to the extent they may be supportive of his claims of prejudice.

Although the court of appeals denied Mr. Gomez's application due to untimeliness, the court also considered the merits of his ineffective assistance of appellate counsel claims, finding they lacked merit.  (ECF Doc. 6-1, pp. 340-41.)  The court explained its reasoning as follows:

> In addition to our finding that appellant's application was untimely filed, we also find that the arguments raised in the application lack merit. In his first argument, appellant claims that appellate counsel was ineffective for failing to argue certain elements relating to the sufficiency of the evidence and the trial court's denial of his Crim.R. 29 motion for acquittal. The specifics of appellant's argument are difficult to discern, but we note that appellate counsel did, in fact, raise the sufficiency of the evidence as an assignment of error, which we rejected in our decision after evaluating the record in its entirety. Having already rejected appellant's sufficiency argument, it is clear that the result of the proceedings would not have been different even if appellate counsel raised the arguments articulated by appellant.
>
> In his second argument, appellant urges that appellate counsel ignored certain remarks concerning the credibility of witness made by the prosecutor during closing, which he claims constituted prosecutorial misconduct. Once again, the outcome of these proceedings would have remained the same even absent the statements identified by appellant. As we noted in our decision, the evidence in this case was "compelling and largely uncontroverted." *Gomez* at ¶ 82. This evidence would have led any reasonable jury to conclude that appellant was guilty beyond a reasonable doubt, notwithstanding any allegedly improper comments from the state during its closing arguments. Because appellant cannot demonstrate prejudice arising from appellate counsel's representation in his direct appeal, his second argument fails.

(*Id.* (emphasis added).)  In its earlier decision, the court of appeals had thoroughly addressed Mr. Gomez's sufficiency of the evidence claim, stating:

> {¶ 66} In his third assignment of error, appellant argues that the trial court erred in denying his motion for acquittal under Crim.R. 29(A). Relatedly, appellant argues in his fourth assignment of error that his conviction is against the manifest weight of the evidence. For ease of discussion, we will address appellant's third and fourth assignments of error simultaneously.
>
> {¶ 67} We review a trial court's ruling on a Crim.R. 29(A) motion under the same standard used to determine whether the evidence was sufficient to sustain a conviction. *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 39-40. To determine whether there exists sufficient evidence to sustain a conviction, we view the evidence in a light most favorable to the prosecution and determine whether "any rational trier of fact could have found the essential

elements of the crime proven beyond a reasonable doubt." (Internal citations omitted.) *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). In making that determination, we do not weigh the evidence or assess the credibility of the witnesses. *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 132. Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

[]

{¶ 69} In the present case, appellant was convicted of one count of importuning in violation of R.C. 2907.07(D)(1), which provides:

> (D) No person shall solicit another by means of a telecommunications device, as defined in section 2913.01 of the Revised Code, to engage in sexual activity with the offender when the offender is eighteen years of age or older and either of the following applies:

> (1) The other person is thirteen years of age or older but less than sixteen years of age, the offender knows that the other person is thirteen years of age or older but less than sixteen years of age or is reckless in that regard, and the offender is four or more years older than the other person.

{¶ 70} Additionally, appellant was convicted of one count of rape in violation of R.C. 2907.02(A)(2), and three counts of rape in violation of R.C. 2907.02(A)(1)(b). R.C. 2907.02(A) provides, in relevant part:

> (A)(1) No person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when any of the following applies:

> * * *

> (b) The other person is less than thirteen years of age, whether or not the offender knows the age of the other person.

> * * *

> (2) No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force.

{¶ 71} Under R.C. 2907.01(A), "sexual conduct" is defined as "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion,

however slight, of any part of the body * * * into the vaginal or anal opening of another." Under the statute, any penetration, however slight, is sufficient to constitute vaginal or anal intercourse.

{¶ 72} In support of his sufficiency and manifest weight arguments, appellant contends that the state failed to introduce evidence that he was the individual who sent M.D. the sexually explicit text messages that were found on her mobile phone. As to the rape counts, appellant asserts that the state produced no evidence of physical or medical injuries to M.D. that would be consistent with rape, and also argues that the state failed to establish when exactly each rape occurred. Having carefully examined the trial record in its entirety, we find that appellant's sufficiency and manifest weight arguments are without merit.

{¶ 73} Regarding the importuning charge, the state introduced several text messages and Facebook messages that were sent to M.D. from appellant's mobile phone and Facebook account when M.D. was 15 years old and appellant was over twice her age. Having lived with M.D. for several years, it is clear that appellant knew M.D. was older than 13 years of age and less than 16 years of age. In many of these messages, appellant employed graphic sexual language in an effort to solicit M.D. to engage in sexual activity with him. For example, in a Facebook message sent from appellant's Facebook account to M.D.'s Facebook account, appellant stated:

> I have to say this I have always been attracted to tall big breast sexy thick nice booty [women] I want you [so] bad right now I'm really trying to make myself go down trying to keep from [masturbating] at the thought of you. Maybe we should not ever meet cause I want you to take advantage of me any and every way you want I know this is fucked up I'm in no shape to see you cause I'll do what you want me to do you may have me eating [your] booty like groceries and my hooked ass would do it I got to find a way to fix me.

In another Facebook message, appellant informed M.D.: "If you [want] to get in the same bed as me and want me to just hold you that's fine [too]. Just understand I'm going to get really hard and you will feel it on your back or butt if I'm holding you."

{¶ 74} Appellant argues that there is no evidence to establish that he was the individual who actually sent the foregoing messages to M.D. However, the record belies appellant's argument. Indeed, appellant acknowledged at trial that the phone number associated with the messages was his phone number. Further, M.D. testified that the content contained in the messages included information that only she and appellant would have known, which led her to believe that appellant was the individual sending the messages. The messages also contained information about questions that were asked of appellant during the stipulated polygraph, which neither M.D. nor T.P. would have known about.

26

{¶ 75} Appellant speculated that T.P. perhaps set him up by sending these messages to M.D. However, it is unclear how T.P. would have had access to appellant's mobile phone since the two were no longer dating when these messages were sent. Further, appellant stated that his children have access to his phone, but he acknowledged that the children were not responsible for the messages in light of the fact that they were only three and six years old at the time.

{¶ 76} The detailed information set forth in the messages sent to M.D., which would have been known only to M.D. and appellant, paired with the fact that appellant's phone number was the source of the text messages, constitutes sufficient evidence that appellant was the individual who sent the messages to M.D. Moreover, we do not find appellant's speculative and unsupported assertion that T.P. sent the messages to be credible. Thus, we conclude that appellant's importuning conviction was not against the manifest weight of the evidence.

{¶ 77} Next, we turn to appellant's arguments concerning the rape convictions. First, appellant asserts that the state's evidence was insufficient to establish that a rape occurred because there was no evidence of physical or medical injuries to M.D. that would be consistent with rape. This argument fails for two reasons. First, the state is not required to support a charge of rape by introducing evidence of physical or medical injuries to the victim. Rather, the victim's testimony alone is sufficient to support a rape charge. *State v. Shoecraft*, 6th Dist. Lucas No. L-16-1228, 2017-Ohio-8771, ¶ 13, citing *State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, 858 N.E.2d 1144, ¶ 53 ("Ohio courts have consistently held that a victim's testimony, if believed, is sufficient to support a rape conviction."). Second, appellant's invited inference that no physical injuries demonstrates that no rape occurred is contradicted by the testimony provided by Mercer and Schlievert, both of whom explained that physical injuries are rare in instances of delayed disclosure due to rapid healing following sexual abuse, particularly in victims of prolonged sexual abuse whose bodies adapt to such abuse over time.

{¶ 78} Appellant also argues that his convictions for rape were not supported by sufficient evidence because the state failed to establish the exact dates the rapes occurred. However, the state was not required to prove that appellant committed the rapes on exact dates. Indeed, "[w]here the exact date and time of an offense are not material elements of a crime nor essential to the validity of a conviction, the failure to prove such is of no consequence and it is sufficient to prove that the alleged offense occurred at or about the time charged." *State v. Fentress*, 8th Dist. Cuyahoga No. 85835, 2005-Ohio-5851, ¶ 21. "The date and time of a rape is not an essential element of the offense." *State v. Buchanan*, 2017-Ohio-1361, 88 N.E.3d 686, ¶ 22 (8th Dist.), citing *State v. Collinsworth*, 12th Dist. Brown No. CA2003-10-012, 2004-Ohio-5902.

{¶ 79} This principle applies with particular force in cases involving sexual offenses committed against minors, because "many child victims are unable to

remember exact dates and times, particularly where the crimes involved a repeated course of conduct over an extended period of time." *State v. Schee*, 6th Dist. Erie No. E-15-048, 2017-Ohio-212, ¶ 46, citing *State v. Mundy*, 99 Ohio App.3d 275, 296, 650 N.E.2d 502 (2d Dist.1994). "The problem is compounded where the accused and the victim are related or reside in the same household, situations which often facilitate an extended period of abuse." *State v. Robinette*, 5th Dist. Morrow No. CA-652, 1987 WL 7153, *3, 1987 Ohio App. LEXIS 5996, *8 (Feb. 27, 1987). "[A]n allowance for reasonableness and inexactitude must be made for such cases considering the circumstances." *Id.*

{¶ 80} During her testimony, M.D. recounted at least four times she was raped by appellant. She testified that the first rape occurred when she was 10 years old. She went on to testify that a second rape occurred while she lived in Maumee, Ohio, at a time that she would have been less than 13 years old. The third rape M.D. detailed occurred shortly after M.D. moved to Sylvania, Ohio, which would have been three months prior to her thirteenth birthday. Finally, M.D. described the fourth and most recent rape, which is the only rape that M.D. detailed that took place after she turned 13 years old. In all of these instances, M.D. confirmed that appellant penetrated her vagina with his penis against her will. This testimony, taken alone, would have been sufficient to support appellant's rape convictions. *Shoecraft*, *supra*, at ¶ 13.

{¶ 81} M.D.'s testimony was corroborated by the messages the state introduced at trial, which contained references to appellant's prior sexual conduct with M.D. During a conversation between appellant and M.D. on Facebook Messenger, appellant told M.D. that "the sex was good." When M.D. responded that she was only 10 years old at the time, appellant stated, "But I was trying to show you." In response to M.D. informing appellant that sex hurt, appellant stated: "Yeah because you really didn't want it. I know if you ever start to want it it would be good. I fucked up bad."

{¶ 82} Given the foregoing testimony and the messages sent from appellant to M.D. that were introduced by the state at trial, we find that appellant's rape convictions were supported by sufficient evidence. Moreover, given the compelling and largely uncontroverted evidence presented by the state, we do not find that this is an extraordinary case in which appellant's rape convictions should be reversed on manifest weight grounds.

{¶ 83} Accordingly, appellant's third and fourth assignments of error are not well-taken.

*Gomez*, 2019 WL 647552, at **10-14; (ECF Doc. 6-1, pp. 148-56.)

In arguing the merits of Grounds One and Two, Mr. Gomez asserts that the state court of appeals' decision on his ineffective assistance of counsel claims was unreasonable and contrary

to clearly established federal law because the court relied on its prior decision, failed to consider the new issue, and should have found his appellate counsel was ineffective.  (ECF Doc. 8, pp. 23-24, 33, 37.)  These arguments are considered in support of his "prejudice" argument.

In *Strickland*, the Supreme Court identified two requirements to establish that an attorney was constitutionally ineffective.  *Strickland v. Washington,* 466 U.S. 668, 687 (1984).  First, a petitioner must demonstrate "that counsel's performance was deficient," which "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  *Id.* at 687.  Second, a petitioner must show "that the deficient performance prejudiced the defense."  *Id.*  To meet this requirement, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," with a reasonable probability being "a probability sufficient to undermine confidence in the outcome."  *Id.* at 694.

Here, the state court of appeals considered Mr. Gomez's claims of ineffective assistance of counsel, including whether the alleged deficient performance "prejudiced" Mr. Gomez.  This was consistent with the *Strickland* standard.  In making its findings, the court relied in part on its own earlier decision on appeal, where it had considered the entire record before rejecting Mr. Gomez's sufficiency of the evidence argument.  The court thoroughly addressed the relevant issues and Mr. Gomez has not shown that it was unreasonable for the court to rely on that prior determination when evaluating the question of prejudice as it related to his claims of ineffective assistance of appellate counsel.  The undersigned therefore finds that Mr. Gomez has not shown that the state court of appeals' decision was unreasonable or contrary to clearly established federal law.  In light of that determination, the undersigned also finds Mr. Gomez is unable to establish actual prejudice based on the alleged ineffective assistance of appellate counsel.

Considering the foregoing, the undersigned finds that Mr. Gomez has not demonstrated "cause" or "prejudice" to excuse the procedural default of his claims in Grounds One and Two.

### c) Petitioner has Failed to Show a Fundamental Miscarriage of Justice

The undersigned finally turns to whether Mr. Gomez's procedural default may be excused on the basis that there will be a fundamental miscarriage of justice if his claims are not considered. *See Coleman*, 501 U.S. at 750.  Mr. Gomez generally asserts that failure to consider his claim "would result in a fundamental miscarriage of justice that this court sits in a position to fix," but does not offer further argument to support such a finding.  (ECF Doc. 8, p. 13.)

"A fundamental miscarriage of justice results from the conviction of one who is 'actually innocent.'"  *Lundgren*, 440 F.3d at 764 (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).  The Supreme Court has explained that: "the fundamental miscarriage of justice exception seeks to balance the societal interests in finality, comity, and conservation of scarce judicial resources with the individual interest in justice that arises in the extraordinary case."  *Schlup v. Delo*, 513 U.S. 298, 324 (1995).  "To ensure that the fundamental miscarriage of justice exception would remain 'rare' and would only be applied in the 'extraordinary case,' while at the same time ensuring that the exception would extend relief to those who were truly deserving, [the] [Supreme] Court [has] explicitly tied the miscarriage of justice exception to the petitioner's innocence."  *Id.* at 322.

Mr. Gomez argues in Ground One that appellate counsel was ineffective for failing to present stronger arguments regarding the sufficiency of the evidence (ECF Doc. 1, p. 6; ECF Doc. 8, pp. 13-33) and in Ground Two that appellate counsel was ineffective for failing to challenge certain statements made by the prosecutor in closing statements (ECF Doc. 1, pp. 6-7; ECF Doc. 8, pp. 33-37).  He does not argue that the fundamental miscarriage of justice

exception should be applied to excuse his default because he is "actually innocent" of the relevant crimes.  (ECF Doc. 8, p. 13.)  Further, he does not offer new reliable evidence that was not presented at trial to establish his factual innocence.  Therefore, the undersigned finds he has failed to satisfy his burden to show that his procedural default should be excused due to a finding of "actual innocence," and that the procedural default of the claims in Grounds One and Two cannot be excused under the fundamental miscarriage of justice exception.

For the reasons set forth above, the undersigned finds the claims in Ground One and Two were procedurally defaulted, and Mr. Gomez has not met his burden to show cause and prejudice or a fundamental miscarriage of justice to excuse that default.  Accordingly, the undersigned recommends that the Court **DISMISS** Grounds One and Two with prejudice.[4]

### 3.     Claim in Ground Three Was Procedurally Defaulted

In Ground Three, Mr. Gomez argues that his constitutional rights to a presumption of innocence and a fair trial were violated when the court had a "heavily armed sheriff's deputy . . . escort and . . . take the stand with [him] as he gave testimony."  (ECF Doc. 1, pp. 7-8, 45-54; ECF Doc. 8, pp. 37-40.)  Respondent argues that Mr. Gomez procedurally defaulted this claim, first because the state court of appeals found his claim barred by *res judicata* and second because he failed to appeal the court of appeals' decision to the Supreme Court of Ohio.  (ECF Doc. 6, pp. 15,22-24; ECF Doc. 10, pp. 11-13.)   Mr. Gomez argues in response that the court of appeals erred in finding his claim barred by *res judicata* and he can demonstrate "cause" and "prejudice" to excuse any procedural default associated with his failure to file an appeal with

---

[4] Because the undersigned recommends dismissal of Grounds One and Two based on procedural default, no recommendation is made as to the merits of Grounds One and Two.  Nevertheless, the undersigned observes that the considerations weighed in finding Mr. Gomez failed to show "actual prejudice" would also support a denial of relief on the merits of both claims.

the Supreme Court of Ohio.  (ECF Doc. 8, pp. 11-13.)  He also argues that failure to consider his claim would result in a fundamental miscarriage of justice.  (*Id*. at p. 13.)

As discussed above, a petitioner may procedurally default by failing "to comply with state procedural rules in presenting his claim to the appropriate state court" *or* by "failing to . . . pursue th[e] claim through the state's ordinary appellate review procedures."  *Williams*, 460 F.3d at 806 (citations and internal quotations omitted).  Respondent argues that Mr. Gomez procedurally defaulted Ground Three under both standards, first because he did not raise the claim on direct appeal—leading to a procedural bar under *res judicata*—and second because he did not pursue his appeal through the state's ordinary appellate review process, failing to file an appeal with the Ohio Supreme Court. (ECF Doc. 6, pp. 22-24; ECF Doc. 10, pp. 11-13.)

### i. Petitioner Failed to Comply with State Procedural Rules

To assess procedural default for failure to comply with state procedural rules, courts in the Sixth Circuit apply the four-prong *Maupin* analysis.  *See Williams*, 460 F.3d at 806 (citing *Maupin*, 785 F.2d at 138).  Respondent argues the standard is met here because Mr. Gomez did not raise the claim in Ground Three on direct appeal and the state court of appeals therefore found the claim procedurally barred under the doctrine of *res judicata*.  (ECF Doc. 6, p. 22.)  Mr. Gomez agrees that the state court of appeals found the claim in Ground Three barred by *res judicata*, but argues that this Court should find no procedural default because the state court misapplied that procedural standard.  (ECF Doc. 8, p. 11.)

Mr. Gomez first raised this due process claim in his state petition for postconviction relief.  (ECF Doc. 6-1, pp. 158-69.)  The trial court denied the petition on its merits, finding Mr. Gomez had failed to "provide any supporting affidavits, documentary evidence, etc. in support of his claim" and did not raise a substantive ground for relief.  (*Id*. at pp. 185-86.)  Mr. Gomez

appealed that denial (ECF Doc. 6-1, pp. 188-219), asserting that the trial court violated his right

to a fair trial and eroded his presumption of innocence when it allowed an armed uniformed

deputy to escort and sit with him on the witness stand (*id*. at pp. 201, 204, 209-19).  The court

of appeals affirmed the denial of Mr. Gomez's petition for postconviction relief, but found it

could "affirm the trial court's judgment without reaching the merits of the petition" because the

issues he raised in that postconviction petition "could have been raised on direct appeal but

were not" and therefore the petition was barred by *res judicata*.  (*Id*. at pp. 238-41.)  Mr. Gomez

did not file an appeal of this decision with the Supreme Court of Ohio.

Under the first prong of *Maupin*, this Court must determine whether Mr. Gomez failed

to comply with a procedural rule.  Ohio's *res judicata* rule provides that:

> Constitutional issues cannot be considered in postconviction proceedings under
> Section 2953.21 *et seq.,* Revised Code, where they have already been or could
> have been fully litigated by the prisoner while represented by counsel, either
> before his judgment of conviction or on direct appeal from that judgment, and
> thus have been adjudicated against him.

*Greer*, 264 F.3d at 675 (quoting *State v. Perry*, 10 Ohio St.2d 175 (1967) (syllabus)).  Thus, a

criminal defendant in Ohio may not seek "postconviction relief on 'any defense or any claimed

lack of due process that was *raised or could have been raised by the defendant at trial,* which

resulted in that judgment or conviction, *or on an appeal* from that judgment.'"  *Wogenstahl v.*

*Mitchell*, 668 F.3d 307, 341 (6th Cir. 2012) (quoting *State v. Cole*, 2 Ohio St.3d 112, 443

N.E.2d 169, 171 (1982)) (emphasis in original).  A "court may apply *res judicata* when the

petition for post-conviction relief does not include any materials out of the original record to

support the claim for relief."  *State ex rel. Miller v. Curran*, No. 75252, 1998 WL 723178, at *1

(Ohio Ct. App. Oct. 15, 1998) (citing *State v. Combs*, 100 Ohio App.3d 90, 97 (1994)).

As a general matter, this Court should "not . . . second guess a state court's decision concerning matters of state law." *Greer v. Mitchell*, 264 F.3d 663, 675 (6th Cir. 2001); *see also Suny v. Pennsylvania*, 687 F. App'x 170, 175 (3d Cir. 2017) ("[F]ederal courts generally will not consider whether the state court properly applied its own default rule to the petitioner's facts.") (citing and collecting cases, including *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").)  However, "when the record reveals that the state court's reliance upon its own rule of procedural default [was] misplaced," the Sixth Circuit is reluctant "to conclude categorically that federal habeas review of the purportedly defaulted claim is precluded." *Greer*, 264 F.3d at 675.  Similarly, while the Sixth Circuit "has repeatedly held that Ohio's *res judicata* rule is an adequate and independent state procedural ground for purposes of procedural default," the circuit has also "held that an incorrect application of a state *res judicata* rule does not constitute reliance on an adequate and independent state ground." *Wogenstahl*, 668 F.3d at 341 (internal citations omitted).  The undersigned therefore turns to "whether the state court correctly invoked its *res judicata* rule." *Id.*

Here, the state court of appeals found Mr. Gomez's due process claim barred by *res judicata* because the claim "could have been raised on direct appeal but w[as] not." (*Id*. at p. 239-40.)  Certainly, the presence of an armed deputy on the witness stand with Mr. Gomez during his trial testimony would have been known to both Mr. Gomez and his trial counsel.  But Mr. Gomez argues it was unreasonable for the state appeals court to find the issue could have been raised on direct appeal because the presence of "an armed uniform deputy . . . inside the witness stand" during his trial testimony was not explicitly noted in the written trial record, making it a "fact[] dehors the record."  (ECF Doc. 8, p. 11.)  Respondent argues in response that

34

the only reason the alleged presence of the deputy was not part of the trial record was "because [Mr. Gomez's] counsel did not object to the deputy on the record," which objection would have been necessary preserve the issue for appeal.  (ECF Doc. 6, p. 23.)

In Ohio, the doctrine of *res judicata* precludes postconviction relief for due process claims that "could have been raised" at trial or on appeal.  *Wogenstahl*, 668 F.3d at 341 (citing *Cole*, 2 Ohio St.3d 112).  Here, regardless of whether the trial record officially documents the presence of an armed deputy on the witness stand with Mr. Gomez, there is no question that his trial counsel could have made a timely objection to the deputy at trial and/or his appellate counsel could have raised the challenge on direct appeal.  Because the facts underlying the claim were available for inclusion in the trial record and the claim thus could have been raised at trial or on direct appeal, the undersigned finds the state court of appeals did not unreasonably find the claim barred in post-conviction proceeding under the doctrine of *res judicata*.  *See Ahmed v. Houk*, No. 2:07-CV-658, 2014 WL 2709765, at *102 (S.D. Ohio June 16, 2014) (finding claim "barred from consideration in post-conviction by the doctrine of *res judicata*" when the information supporting the claim "was available for inclusion in the trial record" and the claim therefore "could have been brought at trial or on direct appeal"), *report and recommendation adopted,* No. 2:07-CV-658, 2020 WL 5629622 (S.D. Ohio Sept. 21, 2020).

Having found that Mr. Gomez failed to comply with a state procedural rule, under the first prong of the *Maupin* analysis, this Court must next determine under the second and third prongs whether the state enforced the rule and whether the procedural rule establishes an adequate and independent state law ground under which the claim may be procedurally defaulted.  *See* 785 F.2d at 138.  The second prong is met, since the state court of appeals enforced the *res judicata* procedural bar.  (ECF Doc. 6-1, pp. 239-40.)  The third prong is also

met, since the Sixth Circuit has held that "Ohio's doctrine of *res judicata* as a procedural bar is regularly applied by the Ohio courts." *Jacobs v. Mohr*, 265 F.3d 407, 417 (6th Cir. 2001).

Because the first three prongs of the *Maupin* analysis have been met, this Court must find the claim in Ground Three to be procedurally defaulted unless Mr. Gomez shows "cause" excusing his failure to raise the claim in accordance with Ohio's doctrine of *res judicata* and actual prejudice resulting from the alleged constitutional violation, under the fourth prong of the *Maupin* analysis. *Maupin*, 785 F.2d at 138. However, Mr. Gomez has not argued that this Court should excuse the procedural default that resulted from the state court's application of *res judicata*. And to the extent Mr. Gomez intended to argue that that the Court should excuse that procedural default because the state court misapplied *res judicata* to his petition, the undersigned has considered that argument and found it to be without merit.

For the reasons stated above, the undersigned concludes that Mr. Gomez has procedurally defaulted on Ground Three of the Petition.

### ii.    Petitioner Failed to Pursue Claim Through Appellate Review Process

Even if Ground Three was not procedurally defaulted based on the application of *res judicata*, Respondent argues Mr. Gomez committed a second procedural default with respect to Ground Three when he failed to appeal the court of appeals' decision on his postconviction petition to the Supreme Court of Ohio. (ECF Doc. 6, pp. 22-24; ECF Doc. 10, pp. 11-13.)

On federal habeas review, a district court cannot consider issues that were not presented at every level of the Ohio state court system. *See Baston*, 282 F.Supp.2d at 661. Where a petitioner has not pursued a claim "through the state's 'ordinary appellate review procedures,'" *Williams*, 460 F.3d at 806 (quoting *O'Sullivan*, 526 U.S. at 848), and "state law no longer allows the petitioner to raise the claim, the claim is procedurally defaulted," *id.* at 806. Here,

Mr. Gomez did not appeal the decision denying his petition for post-conviction relief to the Ohio Supreme Court, and that appeal is no longer available under Ohio law.  *See State v. Nichols*, 463 N.E.2d 375, 378 (Ohio 1984); Ohio S. Ct. Prac. R. 7.01(A)(4)(c).

Because Mr. Gomez failed to present the claim in Ground Three at every level of the Ohio state court system, the undersigned finds Ground Three was procedurally defaulted on this basis as well.  For the sake of thoroughness, the undersigned next turns to the question of whether this Court should excuse this second procedural default of Ground Three.

### iii.    Procedural Default Should Not be Excused

To excuse his procedural default, Mr. Gomez must: (1) show cause for the default and demonstrate that actual prejudice resulted from the alleged violation of federal law; or (2) show that there will be a fundamental miscarriage of justice if the claims are not considered. *See Coleman*, 501 U.S. at 750; *Maupin*, 785 F.2d at 138.  Mr. Gomez argues that the Court should find "cause" and "prejudice" to excuse his procedural default or that a fundamental miscarriage of justice will occur if his default is not excused.  (ECF Doc. 8, pp. 11-13.)

### a)  Petitioner has Failed to Show "Cause" to Excuse Procedural Default

As noted above, Mr. Gomez must point to "something external . . . that cannot fairly be attributed to him" to establish "cause" to excuse procedural default. *Coleman*, 501 U.S. at 753. With respect to his failure to appeal the denial of his postconviction petition to the Supreme Court of Ohio, Mr. Gomez argues that the tolling orders of the Ohio Supreme Court and the Executive Orders of the Governor of Ohio, both in light of the COVID-19 emergency, establish "cause" to excuse his procedural default.  (ECF Doc. 8, p. 12.)  Respondent contends that the relevant tolling orders did not permit the delay, and further notes that Mr. Gomez did not seek leave to file out of time despite an invitation to do so.  (ECF Doc. 10, p. 12.)

37

The state court of appeals denied Mr. Gomez's postconviction petition on March 6, 2020, making his appeal to the Supreme Court of Ohio due on or before April 20, 2020.  (ECF Doc. 8-1, p. 83.)  Mr. Gomez asserts that he understood that deadline to be tolled until July 30, 2020, under the Supreme Court of Ohio's March 27, 2020 tolling order and the Executive Orders of the Governor of Ohio.  (ECF Doc. 8, p. 12.)

The March 27, 2020 tolling order provided: "Notwithstanding the tolling of time requirements imposed by this order, the Court . . . may still require filing in accordance with existing rules . . ." (ECF Doc. 8-1, p. 82.)  On April 14, 2020, the Supreme Court of Ohio entered an order with an effective date of April 21, 2020, which superseded the March 27, 2020 order "as it applie[d] to the time requirements prescribed by the Rules of Practice of the Supreme Court."  *In re Rules of Prac. of Supreme Ct. of Ohio*, 2020-Ohio-1461.  The order provided:

> For any document that has not been filed and for which a time requirement would have expired between March 9, 2020, and April 21, 2020, but for the March 27, 2020 order, the party shall file the document within 30 days of this order. A party that fails to timely file pursuant to this division may file a motion for leave to file out of time, and the Clerk shall accept the motion if the delay in filing is due to the effects of or measures necessitated by the COVID-19 emergency and the motion explicitly states it is being filed because of the COVID-19 emergency.

*Id.* (emphasis added).  Because the time for Mr. Gomez to appeal the denial of his application for postconviction relief expired on April 20, 2020, this order allowed him until May 21, 2020, to file a timely appeal with the Supreme Court of Ohio.  He did not do so.

Mr. Gomez did later submit an appeal to the Supreme Court of Ohio, but the court returned the documents to him with the following explanation:

> The enclosed documents were not filed because they do not comply with Rule 7.01 of the Rules of Practice of the Supreme Court of Ohio.  Specifically, they were not received on time.  The deadline for receipt of documents appealing a

court of appeals' decision dated March 6, 2020 was April 20, 2020.  The enclosed documents were not received until June 18, 2020.

(ECF Doc. 8, p. 12; ECF Doc. 8-1, p. 83 (emphasis added).)  The letter further stated:

> You may file a motion for leave to file out of time if the delay in filing is due to the effects of or measures necessitated by the COVID-19 emergency and the motion explicitly states it is being filed because of the COVID-19 emergency. Please refer to the attached court order from April 14, 2020 for further information.  Copies of the Rules of Practice and Guide to Filing are enclosed.

(ECF Doc. 8-1, p. 83.)  This permission to seek leave to file out of time was consistent with the court's April order.  *In re Rules of Prac. of Supreme Ct. of Ohio*, 2020-Ohio-1461.

Mr. Gomez contends that he was "never alerted to a change to the executive order prior to June 18, 2020," and that there was "[n]o notice to the law library nor the GTL tablet where the first notice was sent to."  (ECF Doc. 8, p. 12.)  But regardless of whether Mr. Gomez received notice of any changes to the court's tolling orders, it is well-established that "ignorance of the law and procedural requirements for filing a timely notice of appeal is insufficient to establish cause to excuse [a] procedural default." *Bonilla*, 370 F.3d at 498; *see also Canales*, 2021 U.S. Dist. LEXIS 134420, at *2 ("[A] petitioner's pro se status and limited access to the prison law library are insufficient to establish cause to excuse procedural default.").

Even if this Court were to accept Mr. Gomez's assertion that he lacked notice of the April 14, 2020 tolling order, and further find that his lack of knowledge supported a finding of "cause" to excuse his procedural default, there is no dispute that Mr. Gomez was ultimately notified of the April order and advised of his right to file a motion for leave to file out of time. (ECF Doc. 8-1, p. 83.)  There is no indication in the record that Mr. Gomez filed a motion for leave to file out of time, and he offers no explanation supporting his "cause" for failing to do so. For the reasons set forth above, the undersigned finds Mr. Gomez has failed to demonstrate sufficient "cause" to excuse his procedural default of Ground Three.

**b)  Petitioner has Failed to Show Actual Prejudice**

Even if Mr. Gomez could establish "cause" to excuse his procedural defaults he must also demonstrate actual prejudice resulted from the alleged violation of federal law in order to excuse his procedural default.  *See Coleman*, 501 U.S. at 750.  For the reasons explained below, the undersigned finds that Mr. Gomez has also failed to demonstrate actual prejudice.

To show actual prejudice to excuse procedural default, Mr. Gomez must show prejudice "based on his constitutional claim, irrespective of his procedural default."  *Maupin*, 785 F.2d at 139.  Here, Mr. Gomez argues only that he suffered prejudice because his inability to timely appeal prevented him from having his postconviction claim heard.  (ECF Doc. 8, pp. 12-13.)  Nevertheless, he does also argue with respect to the merits of Ground Three that the presence of the uniformed deputy by his side while he testified was inherently prejudicial.  (ECF Doc. 8, pp. 37-38.)  The undersigned will consider Mr. Gomez's arguments on the merits to the extent they may be supportive of his claim that he suffered "actual prejudice."

The Supreme Court in *Holbrook v. Flynn* recognized that: "[c]entral to the right to a fair trial, guaranteed by the Sixth and Fourteenth Amendments, is the principle that 'one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial.'" 475 U.S. 560, 567 (1986) (quoting *Taylor v. Kentucky,* 436 U.S. 478, 485 (1978)).  However, the court also explained:

> This does not mean . . . that every practice tending to single out the accused from everyone else in the courtroom must be struck down.  Recognizing that jurors are quite aware that the defendant appearing before them did not arrive there by choice or happenstance, we have never tried, and could never hope, to eliminate from trial procedures every reminder that the State has chosen to marshal its resources against a defendant to punish him for allegedly criminal conduct.

*Id.* Recognizing these competing principles, the *Holbrook* court addressed the following question: "whether the conspicuous, or at least noticeable, deployment of security personnel in a courtroom during trial is the sort of inherently prejudicial practice that, like shackling, should be permitted only where justified by an essential state interest specific to each trial." *Holbrook*, 475 U.S. at 568-69. The court answered the question in the negative, explaining:

> The chief feature that distinguishes the use of identifiable security officers from courtroom practices we might find inherently prejudicial is the wider range of inferences that a juror might reasonably draw from the officers' presence. <u>While shackling and prison clothes are unmistakable indications of the need to separate a defendant from the community at large, the presence of guards at a defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable</u>. Jurors may just as easily believe that the officers are there to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into violence. <u>Indeed, it is entirely possible that jurors will not infer anything at all from the presence of the guards</u>. If they are placed at some distance from the accused, security officers may well be perceived more as elements of an impressive drama than as reminders of the defendant's special status. Our society has become inured to the presence of armed guards in most public places; they are doubtless taken for granted so long as their numbers or weaponry do not suggest particular official concern or alarm.

*Id.* at 569 (emphasis added, citation omitted).

While it did not find the presence of armed guards to be "inherently prejudicial" in the manner of shackles or prison clothes, the *Holbrook* court did recognize it to be "possible that the sight of a security force within the courtroom might under certain conditions 'create the impression in the minds of the jury that the defendant is dangerous or untrustworthy.'" *Id.* (quoting *Kennedy v. Cardwell,* 487 F.2d 101, 108 (6th Cir. 1973), *cert. denied*, 416 U.S. 959 (1974)). The court explained:

> "[R]eason, principle, and common human experience," *Williams, supra,* 425 U.S., at 504, 96 S.Ct., at 1693, counsel against a presumption that any use of identifiable security guards in the courtroom is inherently prejudicial. In view of the variety of ways in which such guards can be deployed, <u>we believe that a case-by-case approach is more appropriate</u>.

*Id.* (emphasis added).  When "a courtroom arrangement is challenged as inherently prejudicial," the *Holbrook* court held, "the question must be not whether jurors actually articulated a consciousness of some prejudicial effect, but rather whether 'an unacceptable risk is presented of impermissible factors coming into play.'"  *Id.* at 570 (quoting *Estelle*, 425 U.S. at 405).  As to the challenged conduct in *Holbrook*—four troopers seated in the first row of the spectator section— the Supreme Court did not find "an unacceptable risk of prejudice" because "[f]our troopers [were] unlikely to have been taken as a sign of anything other than a normal official concern for the safety and order of the proceedings." *Id.* at 571.

Here, Mr. Gomez challenges the following alleged activities:

When Gomez was call[ed] to take the stand in his own defense, as he g[ot] up from the defense table a[n] armed uniformed sheriff's deputy joined him, walked him to the witness stand, got in the witness stand with him and sat down behind Gomez.  The armed uniformed deputy sat in the witness stand as if he was giving testimony.  In fact his presence in the witness stand with Gomez did give testimony.  His presence testified that Gomez is a danger, and untrustworthy.  It inferred culpability and in essence it handcuffed and shackled Gomez to the armed uniformed deputy.

(ECF Doc. 8, pp. 37-38.)  Based on these alleged facts, Mr. Gomez argues "it should be a constitutional error for a[] court to have an armed uniform[ed] deputy escort and take the stand with the accused."  (*Id.* at pp. 39-40.)

While the state court of appeals denied Mr. Gomez's state postconviction petition as barred by *res judicata*, the undersigned observes that the trial court first denied the petition on the merits.  (ECF Doc. 6-1, pp. 184-85.)  Consistent the Supreme Court's decision in *Holbrook*, the trial court found Mr. Gomez's argument "that the mere presence of a court deputy near him while on the stand was so prejudicial that it warrant[ed] vacation of his conviction[]" to be without merit.  (ECF Doc. 6-1, pp. 184-86 (citing *State v. Houston*, 1992 Ohio App. LEXIS 3943, at *3-7 (Ohio App. Ct. 1992) (finding appellant's claim that "the presence of a security

42

officer (deputy sheriff) near the appellant during direct examination and cross-examination resulted in prejudice and thus constituted a deprivation of due process and a fair trial" not well-taken)).)  The trial court recognized, as set forth in *Holbrook* that: "[R]eason, principle, and common human experience counsel against a presumption that any use of identifiable security guards in the courtroom is inherently prejudicial."  (ECF Doc. 6-1, p. 185.)

Consistent with the findings of the state trial court, the undersigned finds the *Holbrook* standard does not support the relief Mr. Gomez seeks in Ground Three.  That court rejected the argument that "conspicuous, or at least noticeable, deployment of security personnel in a courtroom during trial is the sort of inherently prejudicial practice that, like shackling, should be permitted only where justified by an essential state interest specific to each trial."  475 U.S. at 568–69.  Instead, the court found "a case-by-case approach is more appropriate."  *Id.* at 569.  Applying that standard, a court in this district rejected a claim similar to Mr. Gomez's, finding "the presence of a deputy sheriff by the Petitioner's side when he made his unsworn statement at trial does not rise to the level of prejudice contemplated in *Holbrook v. Flynn*."  *See Gray v. Tibbals*, No. 1:11 CV 1056, 2013 U.S. Dist. LEXIS 147384, at *4 (N.D. Ohio Oct. 10, 2013).

As the Sixth Circuit has recognized, "[a]lthough security measures may deprive a defendant of some of the physical indicia of innocence, generally the degree of security exercised over the person of the defendant is within the trial judge's discretion." *United States v. Christian*, 786 F.2d 203, 215 (6th Cir. 1986) (internal quotation and citation omitted).  Here, Mr. Gomez has failed to show that the alleged presence of a deputy sheriff by his side while he testified rose to the level of a constitutional violation.  The undersigned further finds that Mr. Gomez has not shown that the security measure resulted in actual prejudice sufficient to excuse his procedural default on Ground Three.

Considering the foregoing, the undersigned finds that Mr. Gomez has not demonstrated sufficient "cause" or "prejudice" to excuse the procedural default of the claim in Ground Three.

### c)  Petitioner has Failed to Show a Fundamental Miscarriage of Justice

Finally, the undersigned returns briefly to whether Mr. Gomez's procedural default can be excused because there will be a fundamental miscarriage of justice if his claims are not considered. *See Coleman*, 501 U.S. at 750.  As discussed in Section III.B.1.iii.c., *supra*, "[a] fundamental miscarriage of justice results from the conviction of one who is 'actually innocent,'" *Lundgren*, 440 F.3d at 764 (quoting *Murray*, 477 U.S. at 496), and Mr. Gomez has only offered a conclusory argument that failure to consider his claim could result in a fundamental miscarriage of justice (ECF Doc. 8, p. 13).  He has not argued that this exception should be applied because he is "actually innocent" of the relevant crimes.  (*Id.*)  He also has not offered new reliable evidence that was not presented at trial to establish that he is factually innocent.  Thus, Mr. Gomez has not satisfied his burden to demonstrate that his procedural default should be excused due to a finding of "actual innocence," and the procedural default of Ground Three cannot be excused under the fundamental miscarriage of justice exception.

For the reasons set forth above, the undersigned finds the claim in Ground Three was procedurally defaulted, and Mr. Gomez has not met his burden to show cause and prejudice or a fundamental miscarriage of justice to excuse that default.  Accordingly, the undersigned recommends that the Court **DISMISS** Ground Three with prejudice.[5]

---

[5] Because the undersigned recommends dismissal of Ground Three based on procedural default, no recommendation is made as to the merits of Ground Three.  Nevertheless, the undersigned observes that the considerations weighed in finding Mr. Gomez failed to show "actual prejudice" would also support a denial of relief on the merits of that claim.

## IV.    Recommendation

For all the reasons set forth above, the undersigned recommends that the Court

**DISMISS** the Petition with prejudice because all grounds are procedurally defaulted.

Dated: December 29, 2023

*/s/ Amanda M. Knapp*
AMANDA M. KNAPP
UNITED STATES MAGISTRATE JUDGE

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).